**FILED**
Samuel L. Kay, Clerk
United States Bankruptcy Court
Augusta, Georgia
*By jpayton at 1:06 pm, Mar 22, 2011*

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE

SOUTHERN DISTRICT OF GEORGIA
Augusta Division

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 Case |
| | ) | Number <u>09-12350</u> |
| G. DAVID VOLPITTO | ) | |
| | ) | |
| Debtor | ) | |
| ———————————————— | ) | |
| | ) | |
| TODD ADAMS, PAUL CHANCELLOR, | ) | |
| ERICA COLLINS, JOYCE DROSS, JEFF | ) | |
| HORNUNG, LANCE HUDSON, MARY ANN | ) | |
| KINSLER, DEAN LOSS, DENNIS MOBERG | ) | |
| TODD NESLEY, JAMIE PORTERFIELD, | ) | |
| KEITH B. POWELL, ROBERT SARAFIN, | ) | |
| ALAN SMITH, THOMAS E. STARNES, | ) | |
| MATTHEW STEWART, MARTIN J. TAYLOR | ) | |
| GEORGE MAULE, AND CINDI GRIFFITH, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding |
| | ) | Number <u>09-01101</u> |
| G. DAVID VOLPITTO, | ) | |
| | ) | |
| Defendant | ) | |
| ———————————————— | ) | |

<u>**ORDER**</u>

Todd Adams, Paul Chancellor, Erica Collins, Joyce Dross, Jeff Hornung, Lance Hudson, Mary Ann Kinsler, Dean Loss, Dennis Moberg, Todd Nesley, Jamie Porterfield, Keith B. Powell, Robert Sarafin, Alan Smith, Thomas E. Starnes, Matthew Stewart, Martin J. Taylor, George Maule, and Cindi Griffith (collectively, "Plaintiffs") seek to hold Dr. G. David Volpitto ("Volpitto")

personally liable for unpaid employer contributions into the Anesthesia and Pain Medicine Associates, LLC 401(k) Profit Sharing Plan and Trust ("the Plan") in which Volpitto is the Trustee and Plaintiffs further request that this debt be declared non-dischargeable pursuant to 11 U.S.C. §523(a)(4). This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(I) and the Court has jurisdiction pursuant to 28 U.S.C. §1334.

At the end of the trial, Volpitto moved for a judgment pursuant to Federal Rule of Civil Procedure 52(c)[1] made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052 and I deferred ruling until the close of all evidence. See In re Smith, 2008 WL 7880897 at *2 (Bankr. N.D. Ga. August 27, 2008)(reserving ruling on motion for directed verdict based on the absence of a jury and hearing defendant's case and closing arguments by both parties). For the reasons set forth below, I find this debt

---

[1]  Federal Rule of Civil Procedure 52(c) states:

If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

2

is dischargeable.

## FINDINGS OF FACT

I previously ruled on a motion for summary judgment and the facts recited in that order are hereby incorporated by reference. See Order, Dckt. No. 98. Volpitto is the sole owner of Anesthesia and Pain Medicine Associates, LLC ("APM" or "Employer"). He also is the Trustee ("Trustee") of APM's 401(k) profit sharing plan, "Anesthesia and Pain Medicine Associates, LLC 401(k) Profit Sharing Plan and Trust" ("the Plan"). Plaintiffs were employees of APM either as nurse anesthetists or physicians and their claim involves employer contributions for a portion of the calendar year 2006 and all of the calendar year 2007.

In 2003, APM was formed by Dr. Jack Carter and Volpitto. In that same year, the Plan was formed. Dr. Carter and Volpitto were the trustees of the Plan, until Dr. Carter left in 2005, at which time Volpitto became the sole shareholder of APM and the Trustee of the Plan. APM held two contracts to provide anesthesia services at Doctors Hospital ("Doctors Hospital") and at the Evans Surgery Center, respectively. Hospital Corporation of America ("HCA") manages both Doctors Hospital and the Evans Surgery Center. Prior to their employment with APM, many of the Plaintiffs worked at Westside Anesthesia Group, LLC ("Westside Anesthesia") providing services to Doctors Hospital. In 2003, APM began providing these

3

services and many of the Plaintiffs became employees of APM.

Ms. Denning, APM's accountant, testified that Westside Anesthesia had a different type of retirement plan. Westside Anesthesia had an ERISA money purchase plan, where the employer is legally required to make defined contributions to the pension plan. Denning testified that when APM was formed and began formulating its pension plan, she suggested the Plan should be a profit sharing plan rather than a money purchase plan because Westside Anesthesia's owner ultimately had to personally borrow a large sum of money to make the legally required employer contributions. Mr. Hagler, APM's counsel, explained that one of the legal differences in a profit sharing plan and a money purchase plan, is that under a profit sharing plan, employer contributions are discretionary whereas in a money purchase plan employer contributions are mandatory. Karen Dixon Burrows, President of Qualified Plan Administrators, confirmed that APM's plan was a profit sharing plan and that employer contributions are discretionary.

Plaintiffs contend they were never told of the change in the nature of their retirement. Plaintiffs further argued the course of dealing with APM and its predecessors was for the employer to annually contribute an amount equal to 12% of their gross salary into their retirement. APM was not formed until 2003, but many of the employees had worked at Doctors Hospital through various

4

corporate entities and owners since the 1990s. Most of the Plaintiffs[2] worked for APM under oral contract from 2003 until 2006 when written contracts were required as a condition of continued employment.

The nurse anesthetists' employment contracts provide:

6. FRINGE BENEFITS

a. Disability Health and Retirement. Employee shall participate in [APM]'s disability income plan, health insurance plan, and retirement plan under the same terms and conditions as those plans offered to [APM]'s [nurse anesthetists] only so long as those plans are offered to [APM]'s employees as a benefit. [APM] reserves the right to reduce or terminate any such benefit plans at any time.

Trial October 20-22, 2010, Pls.' Ex. Nos. 10-21, 23-24, and 26-28 (emphasis added). Furthermore, each nurse anesthetist contract has an attached term sheet summarizing various benefits, including: "Pension: 12% employer contribution plan for retirement with 3 yr. vesting." Trial October 20-22, 2010, Pls.' Ex. Nos. 10-21, 23-24, and 26-28. This term sheet was used even when Plaintiffs were working under the oral contracts.

The physicians' employment contracts provide:

─────────────────

[2] The following Plaintiffs' contracts were not signed in July of 2006: Jeffrey A. Hornung's employment contract was effective January 8, 2007; Dr. James E. Porterfield's employment contract was effective April 12, 2005; and Dr. Alan M. Smith's contract was effective on January 1, 2005.

5

8. FRINGE BENEFITS: Except as stated herein, Employee shall also be entitled to participate equally with other physician employees in the fringe benefits plans authorized and adopted from time to time by [APM]. Employee's participation and rights under said plans shall be subject to the terms of said plans. <u>Said plans may be amended or terminated at Employer's discretion</u>. These benefits may include group health insurance, group disability insurance, group life insurance and profit sharing or a money purchase pension plan. Provided, however, if a profit sharing or a money purchase pension plan is offered to physician employees, <u>in no instance will Employer's contribution for Employee be more than Twelve Percent (12%)</u> of Employee's Covered Compensation as defined in said profit sharing or money purchase pension plan.

Trial October 20-22, 2010, Pls.' Ex. Nos. 22 and 25 (emphasis added).

The parties acknowledge the pertinent parts of the actual Plan provide:

(c) Non-Elective Contributions: Each Plan Year, the Employer <u>in its sole discretion may</u> make a Non-Elective Contribution on behalf of each Allocation Group . . . and will notify the Trustee in writing of the amount contributed. <u>The amount of the Non-Elective Contribution will be determined by the Employer</u>, and the Employer will notify the Trustee in writing of the amount contributed. Non-Elective Contributions will be made to the Plan subject to the following provisions:

(1) Employer's Determination is Final: The <u>Employer's determination</u> of the amount of its Non-Elective Contribution will be <u>binding</u> on the Trustee, the Administrator and all Participants and may not be reviewed in any manner.

✎AO 72A
(Rev. 8/82)

Trial October 20-22, 2010, Pls.' Ex. No. 3 (emphasis added).

In addition, each of the Plaintiffs appearing at trial received the "Summary Plan Description."[3]  The plan summary states in pertinent part, "the Employer may also make other contributions to the Plan which are called Non-Elective Contributions.  These contributions are <u>totally discretionary, including the discretion to forego a contribution for one or more Plan Years</u>."  Trial Oct. 20-22, 2010, Pls.' Ex. Nos. 1 and 2 (emphasis added).  Volpitto argues the language of the employment contracts, the Plan's language and the plan summary fully informed the Plaintiffs that the employer contributions were discretionary.  Plaintiffs disagree contending the course of dealing was for the employer to make the 12% contribution annually.  That had always been the practice and the Plaintiffs contend Volpitto told them there would be no change from past practice.  They further argue the term sheet requires the employer to make these contributions.

_____

[3] The only named Plaintiff for whom there is neither a signed acknowledgment or an acknowledgment through testimony, is Paul Chancellor.  Mr. Chancellor did not appear at trial to pursue his claim.  Most of the acknowledgments tendered at trial are dated March of 2003 for the Plaintiffs that were employed at that time. Trial October 20-22, 2010, Def.'s Ex. No. 4.  Other acknowledgments were dated later as the respective Plaintiffs were hired. (December 2005 for Cynthia L. Griffith; February 2006 for Todd Nesley; April 2006 for Lance Hudson; June 2006 for Erica Collins; and January 2007 for Jeffrey Hornung.  Trial October 20-22, 2010, Def.'s Ex. Nos. 2 and 4.)

AO 72A
(Rev. 8/82)

Plaintiffs also argue the Plan language does not allow for "retroactive" termination of the benefits. Volpitto contends the termination was not retroactive. APM timely obtained an extension until October 15, 2007 to establish and make any additional 2006 contributions, and the deadline to establish and tender any contributions for 2007 was not until April 15, 2008. Volpitto contends APM timely opted not to fund any additional 2006 contributions or any 2007 contributions.

APM contributed the full 12% from 2003-2005. Traditionally, the timing of the Plan payments was irregular, but, prior to 2006, payments were always made by the deadline. In 2006, only 10% per vested employee was contributed to the Plan, and no employer contributions were made for 2007.

APM was experiencing financial trouble due, in part, to an increased caseload from the burn unit at Doctors Hospital. APM's private insurance case volume dropped while the number of burn unit cases increased. While the medical bills in burn cases generally are very high, a large percentage is uncollectible because there often is no private insurance for such cases. See Trial October 20-22, 2010, Pls.' Ex. No. 36.

Adding to APM's financial difficulties was the concern of obtaining and retaining quality employees to work under the difficult conditions at the burn unit. All the witnesses describe

8

the burn unit work as tragic and very difficult, both emotionally and physically.   These working conditions required increased compensation to obtain and retain quality employees.  Based upon the recommendation of a business consultant, APM substantially raised the salaries of its burn unit nurse anesthetists in the spring of 2007.  This was an effort to obtain and retain qualified burn unit nurse anesthetists and to eliminate the use of expensive nurse locums.

Volpitto's work habits also contributed to the financial concerns.  Plaintiffs complain that Volpitto frequently had other anesthetists cover his call schedule.  This was an added expense because APM paid the covering physician and Volpitto continued to receive his salary without taking a corresponding deduction. Volpitto counters that since 2005, he has been APM's sole shareholder and as such, there is nothing inherently wrong with this practice.  Furthermore, Volpitto testified that he was spending a large amount of time on administrative issues, such as running the Evans Surgery Center.  Nevertheless, it is undisputed that Volpitto was having some perceived personal issues at this time.

On April 25, 2007, a meeting was held between Mr. Hagler (APM's counsel and business consultant), Suzanne Denning (APM's accountant), Glenn Mosley (APM's billing agent), and Volpitto (APM's owner and the Plan Trustee).  Mr. Hagler arranged the meeting to

9

discuss various cost saving measures.  At the meeting, Mr. Hagler suggested several austerity measures, one of which included APM ceasing any employer contributions to the Plan in 2007.  Trial October 20-22, 2010, Pls.' Ex. No. 33.  Volpitto testified that, at the time, he did not agree with Mr. Hagler's recommendations in this regard.  Volpitto testified he listened to Mr. Hagler's proposals but never seriously considered reducing the employer contributions.  Volpitto testified he always listened to his paid advisers but did not always follow their advice.[4]  He testified he continued to think the remaining 2006 contributions and the 2007 contributions would be made.  He thought the other austerity measures along with an additional subsidy from HCA would solve APM's financial difficulties.  At trial, Mr. Hagler confirmed he was unable to talk Volpitto into cutting the contributions, until it became clear that the HCA subsidy would not be forthcoming and the contracts were lost.

As for the other austerity measures, Mr. Starnes testified that Dr. Smith, Volpitto and he worked together as late as July 2007 to come up with various austerity measures, such as Volpitto working

_____

[4]  The testimony of Tommy Starnes, a plaintiff and APM's chief nurse anesthetist, confirms this statement, at least in one instance.  Mr. Starnes testified that Volpitto insisted on a 3-year vesting period of the Plan despite Mr. Hagler's recommendation for a 5-year vesting period.

10

full time, reducing the use of locums, eliminating employee bonuses, reducing staff, and changing various internal procedures. Mr. Starnes noted that Volpitto did not want to upset the nurse anesthetists for fear of losing them and Volpitto always indicated he intended for APM to make the contributions.

At this same time, the employees were becoming increasingly unsettled about APM's failure to make any additional 2006 contributions to the Plan and whether any contributions would be made to the Plan for 2007. In July, Volpitto had Tommy Starnes call a meeting to address APM's staff. At the last minute, Volpitto called and said his plane was delayed and he would be unable to attend the meeting. Volpitto instructed Mr. Starnes to speak with the group and assure them that Volpitto intended for APM to make the employer contributions.

Then, around August 4, 2007, Mr. Hagler called another meeting at which he, Volpitto, Ms. Denning, Mr. Starnes, Dr. Smith and Mr. Mosley were present and they discussed APM's financial situation. At this August meeting, Mr. Starnes became very upset when Mr. Hagler suggested that APM was not legally obligated to make the employer contributions to the Plan. Mr. Starnes indicated Volpitto continued to assure him that he intended for APM to make the employer contributions.

Also, around August 14, 2007, Volpitto held a staff

11

meeting which many of the Plaintiffs attended.  At this meeting Volpitto informed the staff that he intended for APM to make the employer contributions to the Plan.  He also said he was "a man of his word" and the contributions would be made, even if he had to do it personally.  He testified that he continued to believe that APM would be able to make the contributions.  He testified it was always his intention for APM to make the employer contributions.  At the trial, many Plaintiffs testified that they believed Volpitto intended for APM to make the contributions and they did not think he lied to them.  They further indicated they relied upon these statements by continuing to provide services on behalf of APM.

Also, during August 2007, due to the financial difficulties, APM requested HCA provide it with an increased subsidy.  APM sought an increase to $1,000,000.00 for the calendar year 2008 and immediate cash infusion structured as a self cancelling loan to be used to pay all accrued profit sharing contributions for 2006 and projected profit sharing contributions for 2007.  Trial October 20-22, 2010, Pls.' Ex. 59.

In late September 2007, Volpitto was barred from appearing at Doctors Hospital and the Evans Surgery Center.  This came as a surprise to Volpitto.  He was offered the opportunity to request a

12

voluntary leave of absence, which he ultimately did.[5] APM's ultimate financial demise was assured shortly thereafter when, in early October 2007, Mr. Hagler was informed that the additional subsidy would not be forthcoming and Doctors Hospital would not renew its contracts with APM. Trial October 20-22, 2010, Pls.' Ex. Nos. 60 and 61. Mr. Hagler testified this came as a surprise because the last he had heard from HCA's counsel was that APM was performing well under the contracts. Mr. Hagler communicated the news to Volpitto.

With this turn of events, Volpitto turned over management control of APM to Dr. Smith and Mr. Starnes while he retained financial control. On October 10, 2007, Mr. Hagler sent a letter to Dr. Smith and Mr. Starnes directing them to inform the employees that there would be no more employer contributions to the Plan. Trial October 20-22, 2010, Def.'s Ex. No. 25.

Volpitto proceeded in winding up APM's financial affairs. The culmination of these activities resulted in Volpitto receiving

---

[5] During the testimony of Mr. Starnes and Dr. Smith, it became apparent that Volpitto had some personal issues which were brought to the attention of the Medical Staff Assistance Committee of Doctors Hospital and the Medical Executive Committee of the Evans Surgery Center. At trial, this was not discussed in detail, but evidence was tendered showing the Committee unanimously recommended that Volpitto be allowed to request a voluntary leave of absence. See Trial October 20-22, 2010, Letters to Volpitto, Def.'s Ex. Nos. 23 and 24.

13

$601,965.00 from APM after all APM's creditors had been paid.  Ms. Denning testified that Volpitto's distribution was his compensation as president of APM.  She further testified that there was never any commingling of the records/assets between APM, Volpitto and the Plan.  Plaintiffs contend a portion of this $601,965.00 should have been used to fund the 2006 and 2007 employer contributions.

With this background, Plaintiffs first argue Volpitto improperly retroactively changed the Plan because the employment contracts explained that APM's benefits include "Pension:   12% employer contribution plan for retirement [with a graduated vesting schedule]."  Conversely, Volpitto contends such contributions were discretionary and he always intended for APM to make the contributions.   According to Volpitto, but for the economic realities facing the business, APM would have made those contributions, and these economic realities did not become apparent until the end of September, early October.

Plaintiffs also argue Volpitto, as Trustee, should have informed them once he knew changes to the Plan were under serious consideration, which Plaintiffs contend was in April of 2007, when Volpitto met with Mr. Hagler.  They further contend he should have informed them that he interpreted the Plan to allow for contributions to be made at the discretion of the Employer. Plaintiffs contend this was a major departure from the previous

14

plans and the past course of dealing. Plaintiffs contend that Volpitto represented that nothing would change from the past practices, and that his failure to inform them of this material change was a breach of his fiduciary duty.

Conversely, Volpitto contends he never changed the Plan. APM was a separate entity formed in 2003. The Plan also was a separate retirement plan, and was formed in 2003. Volpitto further contends the Plan and plan summary clearly and unambiguously state the contributions were discretionary. Furthermore, he argues it was always his intention for APM to make employer contributions to the Plan. It was not until APM failed, and he lost his livelihood, that it became clear the contributions could not be made.

Next, Plaintiffs argue Volpitto, as the Plan Trustee, should have sued APM to recover the unpaid employer contributions and his failure to do so was a breach of his fiduciary duty. The Plan defines the litigation duties of the Trustee as follows:

> (m) Litigation: The Trustee may begin, maintain, or defend any litigation necessary in connection with the administration of the Plan, except that the Trustee will not be obliged or required to do so unless indemnified to its satisfaction.
>
> (n) Claims, Debts or Damages: The Trustee may settle, compromise, or submit to arbitration any claims, debts, or damages due or owing to or from the Plan.
> .
> .

15

> (p) Miscellaneous:  The Trustee may do all such
> acts (including, but not limited to, margin
> trading and futures and commodities trading) and
> exercise all such rights, although not
> specifically mentioned herein, as the Trustee
> deems necessary.  The Trustee will not be
> restricted to securities or other property of
> the character expressly authorized by applicable
> law for trust investments, provided the Trustee
> discharges its duties with the care, skill,
> prudence, and diligence, under the circumstances
> then prevailing, that a prudent person acting in
> a like capacity and familiar with such matters
> would use in the conduct of an enterprise of
> similar character and with similar aims by
> diversifying the investments to minimize the
> risks of large losses unless under the
> circumstances it is clearly prudent not to do
> so.

Trial October 20-22, 2010, Pls.' Ex. No. 3.

Lastly, Plaintiffs argue Volpitto, as Trustee, should not be allowed to pay for his legal defense from assets of the Plan. Plaintiffs concede Volpitto has not deducted any assets from the Plan except for his legal defense as Trustee and that the Plan allows for payment of the Trustee's legal fees.  However, Plaintiffs state the Plan does not allow for payment of a Trustee's legal fees if the claim against him is for breach of his fiduciary duty.  The relevant Plan provisions state:

> 7.4 COMPENSATION AND EXPENSES
>
> The Trustee, either from the Trust Fund or from
> the Employer, will be reimbursed for all of its
> expenses and will be paid reasonable

16

compensation as agreed upon from time to time with the Employer; but no person who receives full-time pay from the Employer will receive any fees for services to the Plan as Trustee or any other capacity.

.

.

.

.

## 7.8 EMPLOYMENT OF AGENTS AND COUNSEL

The Trustee may employ such agents, counsel, consultants, or service companies as it deems necessary and may pay their reasonable expenses and compensation. The Trustee will not be liable for any action taken or omitted by the Trustee in good faith pursuant to the advice of such agents and counsel. Any agent, counsel, consultant, service company and/or successors will exercise no discretionary authority over investments or the disposition of Trust assets, and their services and duties will be ministerial only and will be to provide the Plan those things required by law or by the terms of the Plan without in any way exercising any fiduciary authority or responsibility under the Plan.

.

.

.

.

## 10.8 LEGAL ACTION

In any claim, suit or proceeding concerning the Plan and/or Trust which is brought against the Trustee or Administrator, the Plan and Trust will be construed and enforced according to the laws of the state in which the Employer maintains its principal place of business, to the extent that it is not preempted by ERISA; and unless otherwise prohibited by law, either the Employer or the Trust, in the sole discretion of the Employer, will reimburse the Trustee and/or Administrator for all costs, attorneys fees and other expenses associated with any such claim, suit or proceeding.

AO 72A
(Rev. 8/82)

Trial October 20-22, 2010, Pls.' Ex. No. 3.

Prior to trial, at a hearing held on July 29, 2010, counsel representing Volpitto in his capacity as Trustee stated the Trustee's legal expenses have been paid in part from the Trust; however, counsel agreed to hold in abeyance any further payment until the Court ruled upon Volpitto's pending summary judgment motion or the matter reached trial. Brief, Dckt. No. 91. The order entered on Volpitto's summary judgment motion did not grant Volpitto summary judgment on this issue. Order, Dckt. No. 98.

### CONCLUSIONS OF LAW

Plaintiffs contend that Volpitto should not be allowed to discharge the employer contributions purportedly owed to them because his actions as Trustee of the Plan constitute a fraud or defalcation while acting in a fiduciary capacity and such debts are nondischargeable under 11 U.S.C. §523(a)(4).[6] The focus of §523(a)(4) is very limited. In order for a debt to be non-dischargeable under §523(a)(4), the Court must find both a fiduciary

---

[6]  11 U.S.C. §523(a)(4) states in pertinent part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

AO 72A
(Rev. 8/82)

relationship existed and that a fraud or defalcation occurred while the defendant was acting in that capacity.   In re Pleeter, 293 B.R. 812, 816 (Bankr. S.D. Fla. 2003).   As the U.S. Supreme Court has pointed out:

> In every case charging breach of ERISA fiduciary duty, then, the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.

Pegram v. Herdrich, 530 U.S. 211, 226 (2000).   Volpitto concedes that as Trustee of the Plan he is a fiduciary, and it is in this capacity that the Plaintiffs seek to hold him personally liable under §523(a)(4).

The issue is whether Volpitto committed a "fraud" or "defalcation" in this fiduciary capacity.   In re Barrett, 410 B.R. 113 (Bankr. S.D. Fla. 2009); In re Kutchins, 2008 WL 5633634 *7 (Bankr. M.D. Fla. Dec. 5, 2008)(plaintiff must prove fraud or defalcation was committed while acting in a fiduciary capacity). Plaintiffs bear the burden of proof to establish by a preponderance of the evidence that their debt is excepted from discharge.   Grogan v. Garner, 498 U.S. 279, 287-288 (1991).

To prove "fraud" under §523(a)(4) Plaintiffs must prove that while acting in his fiduciary capacity: 1) Volpitto made a

19

representation; (2) Volpitto knew the representation was false; (3) he made a false representation with the intention and purpose of deceiving Plaintiffs; (4) Plaintiffs relied upon this representation; and (5) Plaintiffs suffered loss or damage as the proximate result of the representation.  In re Bullock, 2010 WL 2202826 at *7 (Bankr. N.D. Ala. May 27, 2010).

The term "defalcation" is not defined in the Bankruptcy Code.  However, the Eleventh Circuit has stated,

> '[d]efalcation' refers to a failure to produce funds entrusted to a fiduciary,' but that 'the precise meaning of 'defalcation' for purposes of § 523(a)(4) has never been entirely clear.' . . . [T]he best analysis of 'defalcation' is that of Judge Learned Hand in Central Hanover Bank & Trust Co. v. Herbst, 93 F.2d 510 (2d Cir. 1937), in which Judge Hand concluded that while a purely innocent mistake by the fiduciary may be dischargeable, a 'defalcation' for purposes of this statute does not have to rise to the level of 'fraud,' 'embezzlement,' or even 'misappropriation.'

Guerra v. Fernandez-Rocha (In re Fernandez-Rocha), 451 F.3d 813, 817 (11th Cir. 2006) citing Quaif v. Johnson, 4 F.3d 950, 955 (11th Cir. 1993).  Several courts relying on Quaif hold that a defalcation is a failure to produce funds entrusted to a fiduciary.  In re Jackson, 429 B.R. 365 (Bankr. N.D. Ga. 2010); McDowell v. Stein, 415 B.R. 584 (S.D. Fla. 2009); In re Roberson, 231 B.R. 136, 140 (Bankr. S.D. Ga. 1999).

In the case sub judice, the funds in question are the

employer contributions.   The focus is whether the funds were entrusted to a fiduciary.  See ITPE Pension Fund v. Hall, 334 F.3d 1011, 1013 (11th Cir. 2003)("The proper rule, developed by caselaw, is that unpaid employer contributions are not assets of a fund unless the agreement between the fund and the employer specifically and clearly declares otherwise."); Local Union 2134, United Mine Workers of America v. Powhatan Fuel, Inc., 828 F.2d 710, 714 (11th Cir. 1987)(until money is paid by the employer to the plan there are no assets in the plan under the provisions of ERISA).

Plaintiffs argue Volpitto committed fraud, or defalcation, by:  1) failing to inform when a change in the Plan was under serious consideration or that he interpreted the Plan to allow APM to retroactively terminate employer contributions; 2) continuing to tell the employees that the employer contributions would be forthcoming; 3) self-dealing, by taking assets of APM for his own personal gain; 4) failing to pursue litigation against APM for unpaid contributions; and 5) paying for his legal defense in his capacity as Trustee with trust funds.[7]  Plaintiffs aver they relied

---

[7]   Plaintiffs in a post trial brief allege a new theory of recovery, promissory estoppel.  Volpitto contends the Court should not consider this theory as it is raised for the first time after trial and he has not consented to it.  Volpitto is correct.  See Rivinius, Inc. v. Cross Mfg., Inc. (In re Rivinius, Inc.), 977 F.2d 1171, 1176 (7th Cir. 1992) (stating that appellant did not consent to appellee's assertion of the contribution claim because it was not aware that appellee would raise a contribution theory until appellee

AO 72A
(Rev. 8/82)

upon Volpitto's statements by not seeking employment elsewhere, and that they suffered a loss.

**Plan Changes or Material Misrepresentations.**[8]

First, Plaintiffs contend Volpitto committed fraud and defalcation by failing to inform them when a change to the Plan was under serious consideration and by failing to inform them that he interpreted the terms of the Plan to allow APM to retroactively terminate employer contributions. An ERISA plan trustee is a fiduciary and has a duty to fully inform the beneficiaries of the information about the plan and to avoid material misrepresentations. <u>Local Union 2134, United Mine Workers of America v. Powhatan Fuel,</u>

---

filed its post-trial brief after the bankruptcy court bench trial); <u>In re LaBrum & Doak, LLP</u>, 225 B.R. 93, 102 (Bankr. E.D. Pa. 1998)("[N]ew claim is untimely raised only in the last of the post-trial briefs. Consequently, we will not consider it."). Furthermore, even if I were to consider the new theory, Plaintiffs cannot prevail on the estoppel theory as estoppel is not available when the written plan is unambiguous. <u>Hudson v. Delta Air Lines, Inc.</u>, 90 F.3d 451, 457-458 n. 12 (11th Cir. 1996)(stating plaintiffs cannot rely on the alleged uniform oral statements guaranteeing the same level of medical benefits throughout their retirement "because there [is] no federal common law right to promissory estoppel under ERISA in cases involving oral amendments to or modifications of employee plans governed by ERISA."). As discussed in this order, I have found the Plan's language is clear and unambiguous and therefore, Plaintiffs are not entitled to recover under this theory. Additionally, as discussed in detail in this opinion this is not fraud or defalcation while acting in a fiduciary capacity.

[8] Subheadings have been used for convenience only. Legal analysis of all the issues raised by Plaintiffs traverse the entire conclusions of law sections of this order regardless of subheadings.

Inc., 828 F.2d 710, 713 (11th Cir. 1987); <u>Barnes v. Lacy</u>, 927 F.2d 539 (11th Cir. 1991)(employer liable if it made a material misrepresentation about the plan); <u>Berlin v. Michigan Bell Tel. Co.</u>, 858 F.2d 1154 (6th Cir. 1988). An employer may not make a material misrepresentation to beneficiaries of an ERISA plan if an amendment to the plan or the formation of another plan is under serious consideration. <u>See</u> <u>Barnes</u>, 927 F.2d at 544 (if an employer "after serious consideration of a second [retirement plan] represented that [a second retirement plan] was not being considered or used words to that effect, such representation would be characterized as a material misrepresentation.").

Plaintiffs contend Volpitto materially misrepresented that contributions would be made even after APM began to seriously consider ceasing the contributions as early as April 25, 2007, when Volpitto met with Mr. Hagler, Mr. Mosley and Ms. Denning. At the onset, Volpitto points out the Plan has not been amended or changed. I agree.

Fundamentally, the decision to fund, or not fund, the Plan is not a change in the Plan. The Plan and the plan summary clearly provide that employer contributions are discretionary. The discretionary nature of the employer contributions was an attribute of the Plan at its formation. The attachment to the employment contracts is not inconsistent with this discretionary nature. The

23

attachment provides that benefits include a "Pension: 12% employer contribution plan." That is not clearly inconsistent with the terms of the Plan. Moreover, the attachment cannot be read in isolation but must be read in conjunction with the Plan, the plan summary and the employment contracts. Trial Oct. 20-22, 2010, Pls.' Ex. Nos. 1-4, 10-21, 23-24 and 28. The specific language of the Plan and the plan summary clearly sets forth this is a 401(k) profit sharing plan. By law contributions to a 401(k) profit sharing plan are at the employer's discretion. See 26 U.S.C. 412(a) and (e)(2)(requiring minimum funding of certain plans but excepting profit sharing plans from this requirement). All the Plaintiffs appearing at the trial acknowledged receipt of the plan summary. They cannot now say they were mislead about the terms. Furthermore, the employment contracts were made with APM, not with Volpitto, as Trustee. As such, the employer's decision to not make the discretionary employer contributions cannot rise to the level of fraud or defalcation by the Trustee while acting as a fiduciary. Local Union 2134, United Mine Workers of America v. Powhatan Fuel, Inc., 828 F.2d 710, 714 (11th Cir. 1987)("one assumes fiduciary status 'only when and to the extent' that they function in their capacity as . . . fiduciaries not when they conduct business that is not regulated by ERISA."); Bickley v. Caremark Rx, Inc., 361 F. Supp.2d 1317, 1330 (N.D. Ala. 2004) quoting Moench v. Robertson, 62

24

F.3d 553, 561 (3rd Cir. 1995); see Barnes v. Lacy, 927 F.2d 539, 544 (11th Cir. 1991)("employers who act as plan administrators 'assume fiduciary status only when and to the extent that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA.'").

Even if the decision to not make the employer contributions was a change in the Plan, I do not find Volpitto seriously considered the measures prior to the end of September or early October. It is undisputed that Mr. Hagler suggested several austerity measures at the April and August meetings, one of which included reducing employer contributions to the Plan in 2007 to zero. Trial October 20-22, 2010, Pls.' Ex. Nos. 33 and 38. Volpitto did not agree to this proposal and did not appear to take it under serious consideration. Volpitto acknowledges that he listened to all his paid professionals' advice, but he never planned, or seriously considered cutting the contributions until his leave of absence and the termination of APM's contracts with HCA. The Plaintiffs were well aware of the fact that their contributions had not yet been made. The evidence shows that Volpitto was actively pursuing the additional subsidy with HCA and that Volpitto anticipated this subsidy along with other austerity efforts would allow APM to make the contributions. Volpitto always stated he intended for APM to make the employer contributions, until late

September/early October 2007.

In July 2007, APM's employees were getting uneasy about whether employer contributions were going to be made and a meeting was held to address these concerns. Volpitto was unable to attend the staff meeting and asked Mr. Starnes to assure the employees of Volpitto's intention for APM to fund the contributions. Shortly after the meeting with the staff, there was a meeting with Dr. Smith, Tommy Starnes and Volpitto in attendance. At this meeting Volpitto asked Tommy Starnes to devise cost cutting plans. According to Tommy Starnes the main purpose of these measures was to ensure that APM was in a position to fund the employer contributions. No one questions Volpitto's sincerity in these remarks.

Then, at an August meeting, in Mr. Hagler's office, Mr. Starnes became very upset when Mr. Hagler suggested that APM was not legally obligated to make the employer contributions. Mr. Starnes indicated Volpitto again assured him that it was his intent for APM to make the contributions.

Later in August, Volpitto did meet with the staff and assured them that it was his intent for APM to make the contributions. It is this meeting where Plaintiffs say they were mislead. Volpitto stated he was a man of his word and that APM would make the contributions even if Volpitto had to make them

26

personally.     The   issue   is   whether   this   was   a   material misrepresentation.

After considering the evidence, I find the Plaintiffs have not met their burden of proof of establishing that Volpitto made a material misrepresentation because I find he made such statements without the intent to deceive. See In re Thomas, 217 B.R. 650, 653 (Bankr.   M.D.   Fla.   1998)("Proof   of   fraud   in   cases   involving unfulfilled promises requires the plaintiff to show that at the time the promises were made, the defendant knew he could not fulfill them, or had no intention of fulfilling them."). Clearly, APM was having financial difficulties.   All the Plaintiffs were aware the contributions had not been made.   This was not uncommon, as APM often made the contributions irregularly; however, until 2006, the contributions were always made by the deadline. After considering all the evidence, I find Volpitto's testimony that he always intended for APM to fund the Plan to be credible.  He thought the austerity measures and the additional subsidy would be forthcoming and would resolve APM's financial difficulties.     Plaintiffs' salaries were never reduced, to the contrary, APM raised the salaries to remain competitive in the market and to be able to provide quality care to the burn unit.

However, in October 2007, HCA announced that it would not provide the additional subsidy and the contracts would not be

renewed.  At this same time, Volpitto was placed on voluntary leave and banned from the hospital and the surgery center.  With these events, it became clear that APM was not going to overcome its financial difficulties, and that the contributions could not be made.  It was at this point, Volpitto informed the staff through Mr. Hagler that no additional contributions to the Plan would be made.

While it is true that fraud may be inferred from a defendant's conduct, nothing in the record of this case leads me to such a conclusion.  <u>Bell v. Sturgess (In re Sturgess)</u>, Chapter 7 Case No. 90-41750, Adv. No. 90-4210 (Bankr. S.D. Ga. May 22, 1991) (fraud may be established through circumstantial evidence); <u>see also</u>, <u>In re Weaver</u>, 174 B.R. 85, 90 (Bankr. E.D. Tenn. 1994). Specifically, courts may look at a party's pre- and post-transaction conduct to determine fraudulent intent.  <u>Williamson v. Busconi</u>, 87 F.3d 602, 603 (1st Cir. 1996)(stating "'subsequent conduct may reflect back to the promisor's state of mind and thus may be considered in ascertaining whether there was fraudulent intent' at the time the promise was made.").

Volpitto does not deny he told the employees that he was a man of his word and that the contributions would be made even if Volpitto had to personally make them.  Plaintiffs argue Volpitto's failure to direct APM to tender a portion of the $601,965.00 to the Plan to fund the 12% employer contributions for 2006 and 2007 shows

28

that Volpitto never intended to pay the contributions to the Plan, and constitutes a breach of his fiduciary duty. I disagree. First, the very nature of the representation shows it is a personal representation not those of a Plan Trustee. As previously detailed, the testimony of several witnesses show Volpitto was relying upon APM's continued operations and its procurement of the subsidy and the other austerity measures. Second, when Volpitto made these representations and assurances, he fully expected for APM to be able to make the contributions. There was a drastic turn of events in late September, when he had to request a voluntary leave of absence for medical reasons and lost his ability to work at the hospital and the surgery center. Then, in October, he was informed the additional HCA subsidy would not be forthcoming and the HCA contracts with APM would not be renewed. When this became a reality, it became apparent that APM would not survive. It was during this turbulent time, that Volpitto informed Plaintiffs that no additional employer contributions would be made for 2006 and no contributions would be made for 2007 and he began winding down APM. While the contributions ultimately were not made, this was due to unexpected circumstances, including the failed subsidy, the loss of the contracts and Volpitto's leave of absence, not Volpitto's fraud or defalcation while acting in a fiduciary capacity.

Furthermore, these winding up actions were done in

29

✎AO 72A
(Rev. 8/82)

Volpitto's capacity as owner of APM, not as Trustee of the Plan. "A mere breach of contract by the debtor or a mere failure to fulfill a promise to pay is insufficient to establish non-dischargeability." Bell v. Sturgess (In re Sturgess), Chapter 7 Case No. 90-41750, Adv. No. 90-4210 (Bankr. S.D. Ga. May 22, 1991) (J. Davis); see also, In re Weaver, 174 B.R. 85, 90 (Bankr. E.D. Tenn. 1994)(promise of a future action is not a false pretense or false representation). As discussed later, Plaintiffs may have a breach of contract action, but not a §523(a)(4) fraud or defalcation while acting in a fiduciary capacity.

**Language of the Plan, the Plan Summary and the Employment Contracts**.

The Plan and the plan summary clearly state that contributions are discretionary. The plan summary states in pertinent part, "the Employer _may_ also make other contributions to the Plan which are called Non-Elective Contributions. These contributions are totally discretionary, including the discretion to forego a contribution for one or more Plan Years." Trial Oct. 20-22, 2010, Pls.' Ex. Nos. 1 and 2 (emphasis added).

The Plan provides:

> (c) Non-Elective Contributions: Each Plan Year, the Employer _in its sole discretion_ may make a Non-Elective Contribution on behalf of each Allocation Group . . . and will notify the Trustee in writing of the amount contributed. The amount of the Non-Elective Contribution will be determined by the Employer, and the Employer

30

will notify the Trustee in writing of the amount
contributed.  Non-Elective Contributions will be
made  to  the  Plan  subject  to  the  following
provisions:

(1)  Employer's  Determination  is  Final:  <u>The
Employer's determination</u> of the amount of its
Non-Elective Contribution <u>will be binding on the
Trustee</u>, the Administrator and all Participants
and <u>may not be reviewed in any manner</u>.

Trial October 20-22, 2010, Pls.' Ex. No. 3.

Plaintiffs contend that their former employer, Westside
Anesthesia operated a money purchase plan where contributions were
required.  See 26 U.S.C. §412(a)(2)("in the case of a money purchase
plan . . . the employer makes contributions to or under the plan for
the plan year which are required under the terms of the plan.").  It
is undisputed that the Plan is a profit sharing plan, not a money
purchase plan.   Mr. Hagler and Ms. Denning testified that the
Internal Revenue Code makes important distinctions between a "money
purchase plan" and a "profit sharing plan."  Under a money purchase
plan, prospective notice must be given of a change in the employer's
contribution amount, and money purchase plans require employers to
make a minimum funding amount.  There is no corresponding obligation
in a profit sharing plan.   Mr. Hagler testified that this
distinction is a critical one.  In profit sharing plans, the amount
of contributions is totally discretionary.  See 26 U.S.C. §412(a)
and (e)(2)(requiring minimum funding of certain plans but excepting

31

profit sharing plans from this requirement). Indeed, the website for the Internal Revenue Service describes a profit sharing plan and expressly states that contributions are totally discretionary. See http://www.irs.gov/retirement/article0,,id=108948,00.html ("Contributions to a profit-sharing plan are discretionary. There is no set amount that you need to make. If you can afford to make some amount of contributions to the plan, then go ahead.")

During the course of APM's formation and operation, Volpitto told Plaintiffs there was going to be no change, as APM would continue to make the 12% contributions. Again, such statements are not inconsistent with the actions taken, and they do not amount to a fraud or defalcation by Volpitto, as Trustee. He always intended for APM to continue to make a 12% annual contribution. APM's and Volpitto's advisors designed a plan to give APM the greatest flexibility. Each Plaintiff received a copy of the plan summary which clearly identifies APM's Plan as a 401(k) profit sharing plan. Furthermore, the language of the Plan and plan summary clearly state that contributions are discretionary. Plaintiffs were on notice about the nature of the Plan. It was not until September/October 2007 when it became clear that APM had failed as a business that Volpitto's commitment for APM to make the contributions wavered. This does not constitute fraud or defalcation under §523(a)(4).

32

Plaintiffs also complain the Plan does not tie employer contributions to profits of APM. However, as Ms. Burrows testified, it is no longer necessary for employer contributions to be tied to profits in order for a retirement plan to qualify as a profit-sharing plan. See 26 U.S.C. §401(a)(27).[9]

In addition, Plaintiffs point to their employment contracts and the benefits summary sheet, as requiring APM to make these contributions. The nurse anesthetists' employment contracts provide:

> 6. FRINGE BENEFITS
>
> a. Disability Health and Retirement. Employee shall participate in [APM]'s disability income plan, health insurance plan, and retirement plan under the same terms and conditions as those plans offered to [APM]'s CRNA employees only so long as those plans are offered to [APM]'s employees as a benefit. [APM] reserves the right to reduce or terminate any such benefit plans at any time.

Trial October 20-22, 2010, Pls.' Ex. Nos. 10-21, 23-24, and 26-28 (emphasis added). Similarly, the physicians' employment contracts provide:

---

[9]   26 U.S.C. §401(a)(27) states in pertinent part:

The determination of whether the plan under which any contributions are made is a profit-sharing plan shall be made without regard to current or accumulated profits of the employer and without regard to whether the employer is a tax-exempt organization.

33

> 8.  FRINGE BENEFITS:  Except as stated herein,
> Employee shall also be entitled to participate
> equally with other physician employees in the
> fringe benefits plans authorized and adopted
> from time to time by [APM].  Employee's
> participation and rights under said plans shall
> be subject to the terms of said plans.  <u>Said
> plans may be amended or terminated at Employer's
> discretion</u>.  These benefits may include group
> health insurance, group disability insurance,
> group life insurance and profit sharing or a
> money purchase pension plan.  <u>Provided, however</u>,
> if a profit sharing or a money purchase pension
> plan is offered to physician employees, <u>in no
> instance will Employer's contribution</u> for
> Employee <u>be more than Twelve Percent (12%)</u> of
> Employee's Covered Compensation as defined in
> said profit sharing or money purchase pension
> plan.

Trial October 20-22, 2010, Pls.' Ex. Nos. 22 and 25 (emphasis

added).  APM used the benefits summary sheet since its formation in

2003.  Prior to the institution of the written employment contracts,

this benefits summary sheet was the instrument that detailed the

parties' agreement.  The benefits summary sheet provides that

benefits include a "Pension:  12% employer contribution plan for

retirement [subject to a graduated vesting schedule]."  Trial

October 20-22, 2010, Pls.' Ex. Nos. 10-21, 23-24, and 26-28.

Plaintiffs argue this benefits summary sheet obligated APM to

annually make the 12% employer contributions.  However, as stated

before, you cannot read this provision alone.  Furthermore, nothing

in the benefits summary sheet expressly contradicts the

34

discretionary nature of the contributions.    There is an employer
contribution plan, to which the employer had been tendering 12%
annually.    Additionally, the physicians' employment contracts
contemplate that contributions may be less than 12% stating "in no
instance will the employer's contribution . . . be more than 12%."
Trial October 20-22, 2010, Pls.' Ex. Nos. 22 and 25.    In and of
itself, the attachment is insufficient to establish a mandatory
contribution especially in light of the discretionary language in
other instruments and elsewhere in the contracts.

        Furthermore, any contractual obligation was with APM, not
with Volpitto, as Trustee.    The employment contracts did not create
a fiduciary duty for §523(a)(4) purposes, but rather an employee-
employer relationship.    See Local Union 2134 v. Powhatan Fuel, Inc.,
828 F.2d 710, 714 (11th Cir. 1987)("one assumes fiduciary status
'only when and to the extent' that they function in their capacity
as . . . fiduciaries not when they conduct business that is not
regulated by ERISA."); Board of Trustees v. Bucci (In re Bucci), 493
F.3d 635, 643 (6th Cir. 2007)(holding the debtor's contractual
obligation to pay the employer contributions was insufficient to
satisfy the fiduciary capacity requirement under §523(a)(4)); In re
Maynard, 153 B.R. 933, 935 (Bankr. M.D. Fla. 1993)(stating the
relationship between employee and employer does not give rise to a

35

fiduciary duty under §523(a)(4)).

Unlike the employment contracts, the Plan is governed under ERISA which creates a fiduciary relationship. As previously discussed, the attachment to the employment contracts cannot be read in isolation, but must be read in conjunction with the Plan and the plan summary. The Plan, the plan summary and federal law clearly specify that employer contributions to the Plan are discretionary. Nothing in the Plan or in ERISA provides that these unpaid discretionary contributions are Plan assets before they are actually paid into the Plan. The focus of a §523(a)(4) action is whether there has been fraud or defalcation while acting in a fiduciary capacity. APM, as employer, traditionally paid its employees' salaries and made a 12% contribution to the Plan, but its failure to make such payments, by itself, does not amount to a fraud or defalcation while acting as a fiduciary. There may be a contractual obligation upon APM to fund these payments under the employment contracts, but APM's failure to pay the employer contributions does not constitute fraud or defalcation by Volpitto while in a fiduciary capacity as Trustee under the Plan. A breach of contract is different than a breach of fiduciary duty. See Bucci, 493 F.3d at 643 ("The key point for bankruptcy purposes, however, is that [the debtor] had only a *contractual* obligation to pay the employer

36

contributions.  This is not enough, for 'the debtor must hold funds in trust for a third party to satisfy the fiduciary relationship element of the defalcation provision of §523(a)(4).'")(emphasis in original).  For these reasons, I find the failure to fulfill this purported contractual obligation is insufficient to rise to the level of fraud or defalcation while in a fiduciary capacity as required by §523(a)(4).

**Claim of Retroactive Termination**.

I also disagree with the Plaintiffs' contention that the Plan was amended retroactively.  APM obtained an extension from the IRS until October 15, 2007 to establish and tender any additional 2006 contributions; and any contributions for 2007 were not due until April 2008.  So, on October 10, 2007, when the cessation of the contributions was announced to the employees, any outstanding contributions for 2006 and 2007 were not yet legally due and payable.  For these reasons, I find the decision to not fund these employer contributions was not a retroactive termination of the contributions because as a matter of law, no final declaration/payment was yet due/payable.

**Volpitto's Duties**.

As previously discussed, Volpitto wears at least two different hats.  He was the sole owner of APM and he is the Trustee

of the Plan.  At various times, he acted in separate capacities, and these distinctions have significant legal implications.  Plaintiffs' challenge is under §523(a)(4) which focuses solely on whether Volpitto committed fraud or a defalcation while acting in his fiduciary capacity as Trustee of the Plan.  "ERISA fiduciary status 'is not an all or nothing concept.  A court must ask whether a person is a fiduciary with respect to the particular activity in question.'"  See Pegram v. Herdrich, 530 U.S. 211, 225 (2000); see also Local Union 2134, United Mine Workers of America v. Powhatan Fuel, Inc., 828 F.2d 710, 714 (11th Cir. 1987)("one assumes fiduciary status 'only when and to the extent' that they function in their capacity as . . . fiduciaries not when they conduct business that is not regulated by ERISA."); Bickley v. Caremark Rx, Inc., 361 F. Supp.2d 1317, 1330 (N.D. Ala. 2004) quoting Moench v. Robertson, 62 F.3d 553, 561 (3rd Cir. 1995); see Barnes, 927 F.2d at 544 ("employers who act as plan administrators 'assume fiduciary status only when and to the extent that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA.'").

In this case, I find Volpitto was acting in his capacity as the president and sole shareholder of the employer, not as Trustee of the Plan, when he made the decision regarding funding the

38

employer contributions.  Powhatan Fuel Inc., 828 F. 2d at 714("[the president]'s decision to pay the business expenses of the [corporation], in an attempt to keep the corporation from financial collapse, was a business decision [the president] made in his capacity as president of the corporation.").  The Eleventh Circuit, further explained:

> It is not unusual in a closely held corporation for the president and majority stockholder to control the corporation's operations.  However, '[a] corporation is a distinct and separate entity from the individuals who compose it as stockholders or who manage it as directors or officers.'  Thus, this decision by [the president] to pay bills other than the insurance premiums was not made in his capacity as fiduciary of the health plan, it was made as the president of the corporation.  Indeed, until monies were paid by the corporation to the plan there were no assets in the plan under the provisions of ERISA. This distinction in the role of president of the corporation as opposed to the role as fiduciary of the plan does not diminish in any way the obligation of the fiduciary to keep the beneficiaries (employees) advised as to the status of the plan, insurance coverage, etc. . . [The president] was serving in two distinct capacities. One as president of the corporation.  One as the trustee or fiduciary of the employee health plan.  The district court failed to properly distinguish the separate obligation of each office. We reverse the judgment of the district court, vacate the order holding [the president] personally liable.

Id. at 714.  Volpitto, as Trustee, does not set the employer contributions, rather the funding comes from the employer, APM and

✎AO 72A
(Rev. 8/82)

therefore does not constitute a §523(a)(4) fraud or defalcation while in his fiduciary capacity.

**Self-Dealing**.

Next, Plaintiffs argue Volpitto, as Trustee, breached his fiduciary duty by self-dealing. There are no allegations that Volpitto took assets out of the Plan and put them to his own use. Rather Plaintiffs' allegations involve the diversion of corporate assets. Plaintiffs concede Volpitto has not deducted any assets from the Plan except for his legal defense as Trustee, but they argue a portion of the $601,965.00 Volpitto retained from APM after the employer contributions were reduced to zero should have gone to fund the Plan, not to Volpitto personally, especially since Volpitto had assured them that he would personally fund the contributions if necessary. Plaintiffs argue further that, Volpitto, as owner of APM, often had other APM anesthesiologists cover his call schedule. This increased the costs to APM because APM had to pay the covering physicians and Volpitto. Plaintiffs complain these funds could have been used to make the employer contributions to the Plan.

Volpitto again stresses the distinction between when he was acting as employer and when he is acting as Trustee of the Plan. Decisions affecting unaccrued, unvested benefits and other plan design decisions are not subject to ERISA's fiduciary standards. Burns v. Rice, 39 F.Supp. 2d 1350 (M.D. Fla. 1998) aff'd Burns v.

40

Rice, 210 F.3d 393 (11th Cir. Feb. 17, 2000)(unpublished); see also Gay v. Medi-Ray, Inc., 2002 WL 34186938 *6 (S.D.N.Y. July 26, 2002)("Because the determination of contribution amounts to the Plan does not implicate a fiduciary duty under the facts of this case, and because, even if plaintiff could prove diversion of corporate assets, the discretionary nature of the plan by definition does not require any contributions at all, there is no breach of a fiduciary duty under ERISA in this case."); Phillips v. Amoco Oil Co., 799 F.2d 1464, 1471 (11th Cir. 1986)("[T]he ERISA scheme envisions that employers will act in a dual capacity as both fiduciary to the plan and as employer. ERISA does not prohibit an employer from acting in accordance with its interests as employer when not administering the plan or investing its assets.").

The $601,965.00 was never remitted to the Plan and therefore was not an asset of the Plan for which the Trustee had a fiduciary duty. Volpitto contends that the money was paid to him as APM's sole owner only after APM's creditors were paid, and the corporation was winding up its affairs. Ms. Denning, APM's accountant, confirmed this and noted these sums were paid to Volpitto as compensation. Ms. Denning also confirmed there was no commingling of funds of the Plan, APM and Volpitto. The Eleventh Circuit has held absent specific language in the plan to the contrary, unpaid employer contributions are not assets of the plan

41

✎AO 72A
(Rev. 8/82)

until paid. <u>ITPE Pension Fund v. Hall</u>, 334 F.3d 1011, 1013 (11th Cir. 2003)("the proper rule, developed by caselaw, is that unpaid employer contributions are not assets of a fund unless the agreement between the fund and the employer specifically and clearly declares otherwise."); <u>Powhatan Fuel Inc.</u>, 828 F.2d at 714 (stating that until money is paid into the plan by the employer it is not an asset of the plan under the provisions of ERISA). In the case <u>sub judice</u>, because the unpaid funds were never paid into the Plan, Volpitto, as Trustee of the Plan, has not committed a fraud or defalcation as to funds that were never entrusted to him, as Trustee. <u>See In re Roberson</u>, 231 B.R. 136, 140 (Bankr. S.D. Ga. 1999)(defalcation requires, at the least, entrustment of the plaintiff's money or property to the debtor). Also, as previously discussed contributions are discretionary.

This is also true for APM's purported double payment of Volpitto's call coverage. Volpitto contends he frequently had his call covered because he was busy trying to manage the business, including the new contract with the surgery center, obtaining the additional subsidy, and devising and implementing various austerity measures. Plaintiffs contend Volpitto drained APM funds to pay for his call when he should have been working.

In conclusion, Volpitto was the president and sole shareholder of APM and as such there is nothing inherently wrong

42

with him obtaining such compensation.  The $601,965.00 was retained by Volpitto only after the drastic and unexpected turn of events that occurred in September and October of 2007 where he lost his livelihood and learned the subsidy would not be forthcoming.  Such conduct is not a fraud or defalcation while acting in a fiduciary capacity and does not make this debt non-dischargeable under §523(a)(4).

**Failure to Pursue Litigation.**

Next, Plaintiffs argue Volpitto should have pursued litigation against APM for the unpaid contributions.  "Fiduciaries of a plan have a breath of discretion in deciding when, and if, to bring an action to enforce the plan's rights." _Moore v. Am. Fed'n of Television & Radio Artists_, 216 F.3d 1236, 1245 (11th Cir. 2000). At trial, Volpitto testified he thought APM was within its legal rights to cease making employer contributions based upon the terms of the Plan and upon the advice of counsel, and therefore litigation would have been futile and a further waste of the Plan's assets. Based upon the language of the Plan and the state of the law as set forth herein, I find it was not an abuse of discretion to forego legal action on this issue.

**Trust Funds Used for Legal Fees.**

Plaintiffs argue Volpitto's use of trust funds for his legal defense as Trustee is a defalcation under §523(a)(4).

43

Plaintiffs concede Volpitto has not deducted any assets from the Plan except for his legal defense as Trustee.   Plaintiffs also concede the Plan allows for payment of the Trustee's legal fees. However, Plaintiffs argue the Plan does not allow for payment of a Trustee's legal fees if the claim against him is for breach of his fiduciary duty.   I disagree with this blanket statement.

> Although ERISA prohibits, as against public policy, any agreement that purports to relieve a fiduciary of responsibility or liability under ERISA for breach of fiduciary duty, even if the breach was in good faith, that prohibition does not prevent advancement of expenses until liability is determined. In <u>Spickerman v. Central States, Southeast and Southwest Areas Health and Welfare Fund</u>, 801 F.2d 257 (7th Cir.1986), the Seventh Circuit Court of Appeals held that *both ERISA and a plan with appropriate language permit the interim payment or advancement of legal fees to a person defending a breach of fiduciary duty claim.*

<u>Moore v. Williams</u>, 902 F. Supp. 957, 966-67 (N.D. Iowa 1995)(internal citations omitted)(emphasis added); <u>Packer Eng'g, Inc. v. Kratville</u>, 965 F.2d 174, 175-76 (7th Cir. 1992)(stating ERISA allows indemnification of a prevailing trustee); <u>Leigh v. Engle</u>, 858 F.2d 361, 369 (7th Cir. 1988)(where the trust instruments allow for reimbursement of fees and where the trustee prevails in his defense, there is "no statutory or common-law basis for denying fees to a prevailing trustee where the trust documents specifically contemplate such reimbursement."); <u>see also Snook v. Trust Co. of</u>

44

AO 72A
(Rev. 8/82)

<u>Georgia Bank of Savannah, N.A.</u>, 909 F.2d 480, 487 (11th Cir. 1990)(applying Georgia law).   Moreover, ERISA allows for the "reimbursement of expenses properly and actually incurred" by a trustee and for payment of the attorney's fees to a prevailing party.  <u>See</u> 29 U.S.C. §§1108(c)(2) and 1132(g)(1).

The relevant Plan provisions state:[10]

7.4 COMPENSATION AND EXPENSES
The Trustee, either from the Trust Fund or from the Employer, will be reimbursed for all of its expenses and will be paid reasonable compensation as agreed upon from time to time with the Employer; but no person who receives full-time pay from the Employer will receive any fees for services to the Plan as Trustee or any other capacity.
.
.
.
.

7.8 EMPLOYMENT OF AGENTS AND COUNSEL
The Trustee may employ such agents, counsel, consultants, or service companies as it deems necessary and may pay their reasonable expenses and compensation.  The Trustee will not be liable for any action taken or omitted by the Trustee in good faith pursuant to the advice of such agents and counsel.  Any agent, counsel, consultant, service company and/or successors will exercise no discretionary authority over investments or the disposition of Trust assets, and their services and duties will be ministerial only and will be to provide the Plan

---

[10]  As previously briefed by Volpitto's counsel, section 10.16 of the Plan by its terms concerns the indemnification of the Trustee after liability is established.  <u>See</u> Dckt. No. 91.  Since I have found Volpitto has not incurred any liability for breach of a fiduciary duty, section 10.16 is inapplicable.

45

AO 72A
(Rev. 8/82)

> those things required by law or by the terms of
> the Plan without in any way exercising any
> fiduciary authority or responsibility under the
> Plan.
> .
> .
> .
> 10.8 LEGAL ACTION
> In any claim, suit or proceeding concerning the
> Plan and/or Trust which is brought against the
> Trustee or Administrator, the Plan and Trust
> will be construed and enforced according to the
> laws of the state in which the Employer
> maintains its principal place of business, to
> the extent that it is not preempted by ERISA;
> and unless otherwise prohibited by law, either
> the Employer or the Trust, in the sole
> discretion of the Employer, will reimburse the
> Trustee and/or Administrator for all costs,
> attorneys fees and other expenses associated
> with any such claim, suit or proceeding.

Trial October 20-22, 2010, Pls.' Ex. No. 3.  The Plan's language is clear.  It does not forbid the reimbursement of the legal defense of the Trustee if the allegation is for breach of his fiduciary duty. It states, "[i]n any claim, suit or proceeding concerning the Plan and/or Trust which is brought against the Trustee . . . the Employer or the Trust, in the sole discretion of the Employer, will reimburse the Trustee and/or Administrator for all costs, attorneys fees and other expenses associated with any such claim, suit or proceeding." Plan, section 10.8.(emphasis added).  Therefore, I find Volpitto has not committed a fraud or defalcation pursuant to 11 U.S.C. §523(a)(4) with respect to the reimbursement of his attorney's fees

46

for his legal defense, as Trustee.

For the foregoing reasons, it is therefore ORDERED that the debt owed to Plaintiffs is dischargeable.

_Susan D. Barrett_
SUSAN D. BARRETT
CHIEF UNITED STATES BANKRUPTCY JUDGE

Dated at Augusta, Georgia

this _22ⁿᵈ_ day of March 2011.

47

%AO 72A
(Rev. 8/82)